No. 2936
Second Circuit

---

GRAY v. BROUILLETTE

---

(Apr. 8, 1927. Opinion and Decree.)

---

(Syllabus by the Court)

1. Louisiana Digest—Appeal—Par. 625.
The finding of fact by the trial court will not be disturbed on appeal unless manifestly erroneous.

Appeal from the Twelfth Judicial District Court of Louisiana, Parish of Avoyelles. Hon. B. P. Gremillion, Judge.

Action by Mrs. Irene Lurty Gray, widow of C. W. Keller, deceased, against Leon Brouillette.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Porterie & Bordelon, of Marksville, attorneys for plaintiff, appellant.

Bordelon & Normand, of Marksville, attorneys for defendant, appellee.

STATEMENT OF THE CASE

REYNOLDS, J.    Plaintiff sues the defendant to compel him to vacate certain premises belonging to her of which he has possession.

Defendant claims to have leased the premises from the plaintiff for the year 1927 and refuses to vacate.

On these issues the case was tried and there was judgment in favor of the defendant and the plaintiff appealed.

OPINION

Our learned brother of the District Court gave written reasons for the judgment rendered by him, as follows:

"In the fall of 1926, the plaintiff having a hay farm of about 65 acres ready for harvest, secured the services of defendant to harvest the same. Plaintiff was to furnish all necessary implements and defendant all necessary teams, labor and wire, and they were to share equally in the hay harvested.

"Defendant began about the first days of October and worked until about December 3, 1926, harvesting during that time about 2000 bales of hay.

"About three weeks after Brouillette began operations on the hay farm, he moved on the place with his family, taking along with him his stock and corn and household furniture. He claims that he has a contract of lease from the plaintiff of

the hay farm of 65 acres plus 25 acres for corn for the year 1927. This contract he contends is a verbal contract entered into about three weeks after he started working.

"Plaintiff sues to eject him from her property because she contends that he has no contract for the year 1927; that he was to be given a contract by her for 1927 if he harvested the hay satisfactorily during the fall of 1926 and that that contract was to be in writing.

"Both parties cite Laroussinni vs. Werlein, 52 La. Ann. 424, 27 So. 89, and especially paragraphs 2 and 3 of the syllabus, plaintiff holding that the case at bar comes under paragraph 3, and defendant that it comes under paragraph 2 thereof.

"Paragraph 2 reads as follows:

" 'And if such a verbal contract be made, and subsequently the parties agree that the same shall be reduced to writing and be signed, and afterwards there is a failure to reduce it to writing and to signature,— one of the parties refusing—it is still enforceable as a binding contract.'

"Paragraph 3 reads as follows:

" 'But if, when a verbal contract of lease is agreed, it is understood, contemplated and intended that it should be reduced to writing, that there should be a written lease, and that the written lease should take the place of and stand for what had been agreed on verbally in respect to the leasing of the property, then until the writing is drawn up and signed the contract is inchoate, and either party may, before signing, recede.'

"The testimony is at variance in many particulars. The court regrets that the note of evidence is not transcribed, but, owing to the urgency of the case, will have to trust to memory.

"Plaintiff says that defendant was to get a contract for 1927 if he did the work of 1926 satisfactorily. Just what is meant by satisfactorily has not been explained, but the court will presume that it means that defendant would be expected to do as well as reason would demand under existing conditions, basing his actions upon the conduct or operations of others engaged in the same occupations around him.

"Mr. C. W. Smith attended to the farm of the plaintiff, except in matters of lease to which she personally attended. She said that she was to lease the property to defendant if he did the 1926 harvest satisfactorily. That if that happened she was to give him a contract—the usual way. What did she mean by the usual way? There is no explanation of her meaning, unless that it was to be done as before, that is, verbally. But be that as it may, she says that because he did not come up to his agreement to cut the hay satisfactorily, she did not give him a contract for 1927. We must first look into the question as to whether or not the hay was harvested as well as could be reasonably expected. Considering the testimony on both sides in connection with the equipment furnished by plaintiff, the court is of the opinion that there is a preponderance in favor of the defendant to the effect that he did the best he could, or as well as could be reasonably expected of him, or again as well as the other hay-makers in that section.

"The point is raised that the plaintiff had to do some harvesting herself; but the court does not recall any testimony showing that Brouillette at any time gave up his job, or requested plaintiff to harvest; on the contrary, the court is under the impression that Smith testified that Brouillette remonstrated or found fault with him for attending to the hay.

"Now, we come to the question of a written contract.

"As to that, the court finds that the evidence, that is, the oral evidence, about balances on both sides, and none of the witnesses are shown to be unworthy of belief. But we find several circumstances in the case. The plaintiff says there was to be a written contract, then a contract in the usual way. Brouillette says that there was a contract—a verbal contract entered into about three weeks after he began harvesting the hay, and in pursuance with said verbal contract he moved everything on the place; that under that contract he was to furnish all implements for 1927. We find him buying a power press paying a part of it cash and Mr. Smith securing the balance. We find Brouillette attending to a tractor and paying for repairs himself. We find John Park under order to move off the place or remain as a yard man. We find Smith telling Rabalais, Park and

Haley that the place was rented for 1927. These are the circumstances which added to the balancing testimony of Brouillette show that there is something in his contention.    Otherwise, why should Brouillette be buying a power press and Smith making good for him if 1927 was not in contemplation?    Plaintiff was to furnish all implements.   Why should Brouillette attend to a tractor and pay for repairs if not for the same reason?   Why should John Park be ordered to move or stay as a yard man but not to farm, if the corn land had not been leased?   Why should Smith tell Rapalais that he was glad that he would not have to worry about the place in 1927, that it was rented to Brouillette?   Why should he also tell Park and Haley that it was rented?   Again, why should Brouillette go to the trouble and expense of moving everything he had from Plaucheville to Hamburg if there was no contract? And without any objection from plaintiff? These conditions and circumstances in the court's opinion show a preponderance of evidence in favor of the defendant.

"Plaintiff says that she had no way of testing defendant's ability; yet he did the same work for her in 1925 and the presumption is that she was satisfied, else Smith would not have gone after him at three different times for 1926.

"No time limit was set to harvest the hay; no conditions but that she was to furnish the implements and he the teams, labor and wire.

"The court is not satisfied with plaintiff's explanation of that written contract as against the circumstances above stated, and will rather hold that from the evidence, oral and circumstantial, of defendant's side, that there was a verbal contract with probably an intention of later reducing it to writing, and for that reason will apply paragraph 2 of the syllabus of the decision quoted above as applying, and, in view of that, will render judgment in favor of defendant; restricting him, however, to the land and premises as originally intended, and no more."

After carefully reading all the pleadings and evidence and the able briefs of counsel we are convinced that the judgment of the court is fully supported by the evidence.

Defendant, Leon Brouillette, testified, page 2:

"Q.  During the month of October, 1926, you moved on Mrs. Keller's place?
"A.  Yes.
"Q.  Did you have an agreement with Mrs. Keller for the lease of this property for the year 1926, or was it an agreement with Mrs. Keller for the removal of her hay that was already raised for that year?
"A.  I had also rented with her the place for 1927.
"Q.  For 1927?
"A.  Yes; this year.
"Q.  You had that?
"A.  Yes, when I moved on the place.
"Q.  Did you have any lease with Mrs. Keller for the year 1926?
"A.  No; I did not have any lease for 1926.
"Q.  Is it not a fact, as stated in Mrs. Keller's petition, that if a lease were entered into between you and Mrs. Keller for 1927, that lease would have been reduced to writing?
"A.  No; when I made the lease, we made a first verbal lease.   After that I spoke about renting the property for several years on account it was expensive to buy tools and make hay; but not when I first leased.   When I moved there our bargain was made for 1927.
"Q.  Is it not a fact, then, that the lease for the year 1927 was to have been reduced to writing?
"A.  We spoke about that, yes, but afterwards."

Charles W. Smith, nephew of the plaintiff, testified, pages 31 and 32:

"Q.  Did you ever tell any one after that, that the place was rented for next year?
"A.  Yes, but I did not explain to him anything about the contract.
' Q.  Whom did you tell that to?
"A.  I told John Parks, who was living with me at the time.
"Q.  What did you tell him?
"A.  That we were going to let Brouillette have the place for another year; but I did not go into particulars or state to him what our conditions or bargain was.
*  *  *
"Q.  Did you tell Parks he had to return his house?

"A. No, I didn't tell him that.

\* \* \*

"Q. Did you ever tell him, after that 'If you want to stay, I will build a house for Brouillette's son to live in so you can stay in the house you are in, and you will do the yard work and the lot work?'

"A. There was some talk of building a house; he said he wanted to work by the day.

\* \* \*

"Q. Did you tell him that day, 'I am glad I don't have to worry about the hay for next year. I have rented the place to Brouillette and he can take care of it?'

"A. I told him I had rented the place, but I did not tell him the particulars or the conditions."

Thomas Rabalais testified, page 75:

"Q. During the time you worked on this tractor, did Smith tell you anything concerning the lease of the Keller place for 1927?

"A. Yes, he told me on the way going, he was glad he would not have to worry with the crop for 1927. I asked him why, and he told me Mrs. Keller had rented it to Brouillette."

John Parks testified, pages 78 and 80:

"Q. Why did you leave there?

"A. Well, for two reasons; one reason —I had to borrow all my tools and make the 1926 crop, and the second reason was that they had rented the place to Brouillette for 1927.

"Q. How do you know they had rented the place to Brouillette for 1927?

"A. He told me.

"Q. Who?

"A. Smith, and also Madam Keller.

\* \* \*

"Q. When Mrs. Keller and Mr. Smith spoke to you and said they would need the place for Brouillette, for 1927, they did not tell you whether or not the bargain had been completed, not that the lease was going to be in writing or verbal?

"A. No.

"Q. Absolutely nothing to that effect, did not mention their bargain or under what conditions or anything else?

"A. No, they just told me they had rented the place to Brouillette for 1927."

Robert Haley testified, page 88:

"Q. Did you hear any statement by Mrs. Keller or Smith relative to that property being leased for 1927?

"A. No, but Smith told me the place was rented for 1927.

"Q. When was that?

"A. That was some time about the last of October or the first of November."

Alphonse Bordelon testified, pages 108, 109:

"It is agreed by counsel for both the plaintiff and for the defendant that if Alphonse Bordelon were present on the stand he would testify that he was present when the plaintiff and defendant entered into an alleged verbal agreement of lease for 1927, and that he would testify, in substance, with reference thereto, the same as defendant has done, defendant being his father."

Plaintiff's learned counsel have cited numerous well-selected authorities in support of their contention that where parties enter into a verbal contract, one with the other, and it is the intention to reduce to writing the agreement, to be signed by all concerned, the covenant or agreement cannot be said to be perfected or become exigible until so written up and signed.

But in view of the fact that we are convinced that plaintiff and defendant entered into a completed verbal contract of lease by which plaintiff leased certain land to the defendant and defendant accepted the lease and moved on the land before the question of a written lease came into the case, we have not found it necessary to discuss these authorities on that point. Neither have we found it necessary to discuss the question as to whether or not defendant properly harvested the hay crop of 1926, for the same reason.

We are convinced that after defendant had moved his family on plaintiff's property plaintiff became dissatisfied by reason of the fact that defendant complained of

Charlie Smith taking possession of and cutting certain of the hay crop of 1926, and, in addition thereto, Charlie Smith testified, page 36:

"Q. Were there any objects or reasons why the proposed contract was not carried out except that Brouillette failed to harvest the hay in a workmanlike manner?

"A. Yes, there were other reasons, but the reason the contract was not entered was because he was not competent to carry out the 1926 understanding.

"Q. Would you mind stating the other objection?

"A. You want me to tell you why?

"Q. Yes.

"A. Then, one of the reasons was, when he spoke to Mrs. Keller she did not know he had a jack he was going to move on our place.

"Q. That is the whole cause of the trouble?

"A. No, he brought a crazy negro on the place.

"Q. Were there any other objections?

"A. He was not competent to handle the hay crop."

It would serve no useful purpose to discuss in detail all of the conflicting testimony of plaintiff's and defendant's witnesses. The judge of the lower court, who heard the witnesses testify and observed their demeanor on the witness stand, give credence to defendant's contention that he entered into a completed verbal contract with plaintiff for the lease of the property for the year 1927.

In our opinion the judgment appealed from is correct, and accordingly it is affirmed.